**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| **v.** | : | **Docket No. 2:17-CR-00120-001** |
| **EMMA SEMLER** | : | |

**SENTENCING MEMORANDUM OF DEFENDANT EMMA SEMLER**

Defendant, EMMA SEMLER, by and through her counsel S. PHILIP STEINBERG, respectfully submits the following Memorandum to assist the Court in fashioning a just and fair punishment which is not greater than necessary to accomplish the fundamental objectives of sentencing as articulated in 18 U.S.C. § 3553(a).

## I. INTRODUCTION

Emma Semler will appear before this Court to be sentenced for one count of Distribution of heroin resulting in death in violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(C) and 18 U.S.C. § 2; and one count of distribution of heroin resulting in death within 1,000 feet of a playground and in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2.

## II. PROCEDURAL HISTORY

On March 8, 2017, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 2-count indictment charging Emma Semler with distribution of heroin resulting in death and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2;

and distribution of heroin resulting in death within 1,000 feet of a playground and aiding and abetting, in violation of 21 U.S.C. § 860(a) and 18 U.S.C. § 2. On November 30, 2018, a jury trial commenced before the Honorable Gene E.K. Pratter. On December 11, 2018, following a seven (7) day jury trial, the jury returned a verdict of guilty as to Count 1 and 2 of the Indictment. Thereafter, according to standard practice, this Court ordered a Pre-sentence Investigation Report ("PIR"). On February 25, 2019, the report was authored and distributed by United States Probation Officer Christopher L. Boyer.

## III. <u>FACTUAL HISTORY</u>

For the Court's convenience, the offense conduct is adequately described in the PIR at paragraphs 7 through 14.

By way of further information, on May 9, 2014, Emma Semler confined within the vice of her addiction purchased heroin for, and used heroin with, Jennifer Werstler. Ms. Werstler died as a result of an overdose after using the heroin purchased by Emma Semler. Ms. Semler fled, and subsequently learned of Ms. Werstler's death the following morning. She promptly used the remaining heroin that killed Ms. Wrestler the night before.

## IV. <u>OBJECTIONS TO OR DEPARTURES FROM THE SENTENCING GUIDELINES</u>

Counsel for Ms. Semler would respectfully withdraw the objection to the PIR (paragraph 17) in which Ms. Semler may be entitled to a reduction in the offense level for acceptance of responsibility. While initially, counsel was under the impression that trial counsel argued only legal theory; first, as to Ms. Semler's culpability as an addict in "joint possession" of the heroin, and; second, as to whether the heroin purchased by Ms. Semler was the proximate cause Ms. Werstler's death; after having read the entirety of the trial transcript, counsel's first impression was wrong. Asking the Court to now apply a USSG § 3E1.1 reduction would continue to

compromise the integrity of Ms. Semler's argument in the instant matter, as such, this objection is withdrawn.

Counsel for Ms. Semler would respectfully renew the objection to the PIR (paragraph 29) in which Ms. Semler's juvenile adjudication should not count towards Ms. Semler's criminal history calculation. concurrently, the two offenses listed in paragraphs 30 and 31 arise from a single incident and, as such, should only be counted once for the purposes of calculating Ms. Semler's criminal history category. Unless requested by the Court, no additional argument will be offered on this issue.

## V. SENTENCING CONSIDERATIONS

As the Supreme Court has consistently asserted, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall v. United States*, 128 S.Ct. 586, 598 (2007) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996). This enduring principle was given new life in *United States v. Booker*, 543 U.S. 220, 244 (2005), where the United States Supreme Court held that those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory (18 U.S.C. § 3553(b)(1)), or which rely upon the Guideline's mandatory nature (18 U.S.C. § 3742(e)), to be incompatible with the Sixth Amendment. Accordingly, the Court severed and excised those provisions, thereby rendering the Guidelines "effectively advisory." *Id.* at 245.

The 3rd Circuit has developed a three-step approach to sentencing that district courts must follow in the wake of *Booker*:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculation under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3rd Cir. 2006) (quotation marks, brackets, and citations omitted), citing *United State v. King*, 454 F.3d 187, 194, 96 (3rd Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 329-30 (3rd Cir. 2006). Thus, steps one and two mirror the pre- *Booker* scheme, in which any sentence outside the applicable sentencing range must be imposed pursuant to the departure framework provided by the Guidelines.

It is 18 U.S.C. § 3553(a), however, that ultimately governs the imposition of the defendant's sentence, with the Guidelines calculation operating as merely one factor amongst the variety of considerations listed in this statute. *See Booker*, 543 U.S. at 246. As the Supreme Court has emphatically stated, a sentencing judge "may not presume that the Guidelines range is reasonable." *Gall*, 128 S.Ct. at 596-97. Rather, it is the mandate in 18 U.S.C. § 3553(a) that "[t]he court shall impose a sentence sufficient, ***but not greater than necessary***, to comply with purposes set forth in paragraph (2) of this subsection," that guides trial courts' sentencing determinations. 18 U.S.C. § 3553(a) (emphasis added). These purposes, as listed in 18 U.S.C. § 3553(a)(2), include the need for the sentences imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed education and vocational training, medical care, or other correctional treatment in the most effective manner.

Also, sentencing courts are directed to consider the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1));

(2) the kinds of sentences available; (18 U.S.C. § 3553(a)(3));

(3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6)); and

(4) the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7));

As the 3rd Circuit has been adamant in emphasizing, "[t]he record must demonstrate the trial court gave meaningful considerations to the § 3553(a) factors. *Cooper*, 437 F.3d at 329.

In addition to Section 3553, other statutory sections also provide district courts with guidance in sentencing. In particular, in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is **not** an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added).

## VI. APPLICATION OF THE SENTENCING FACTORS

Applying the statutory factors set forth in 18 U.S.C. § 3553(a) to Ms. Semler's case, Ms. Semler requests this Court vary substantially downward from the advisory sentencing guidelines for the reasons set forth below.

### A. The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

The options available to this Court with respect to what kind of sentence to impose upon Ms. Semler are a minimum term of 20 years to a maximum term of life incarceration, at least six

years of supervised release, and a maximum fine of $2,000,000 along with a mandatory special assessment of $100 for Count 2. Given an offense gravity score of 40 and a prior criminal history score of eight, the guidelines call for a standard range of punishment between 360 months to life imprisonment, a fine between $25,000 and $2,000,000, and a term of at least six years of supervised release.

In candor, the only issue left for debate is whether a sentence of more than 240 months is "minimally sufficient" to accomplish the goals of sentencing.

**History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)**

The story of Emma Semler is tragic. Her catastrophic addiction to heroin will in many ways define her life.

Ms. Semler was raised in Abington, Pennsylvania with her parents and two siblings. Both her mother and father were employed in upper level positions within their respective pharmaceutical employers and were able to meet the needs of all of their children as a married couple. On the surface, Ms. Semler's childhood would appear to be an exemplar of the modern American family. However, her parent's bitter divorce in 2005 led to a vicious downward spiral into the abysmal depths of heroin addiction.

As her father developed an addiction to alcohol and narcotics, he began encouraging his children to experiment with narcotics as a distorted means of gaining life experience. Dissention from Mr. Semler's will was remedied by physical abuse. Mr. Semler abused Emma Semler because he was "frustrated and angry" that his wife was in love with another woman.

Emma Semler had a significant spinal surgery at age thirteen (13), for which she was prescribed opiates as a way of managing the pain. Around this same time, Ms. Semler's father would purchase alcohol for her. He also began smoking marijuana with Ms. Semler and her

siblings. As a result, Ms. Semler and her siblings' adolescence were dominated by the normalization of drug abuse; a normalization which culminated in Ms. Semler's perpetual subjugation of her heroin addiction.

It is undisputed that our country, and more specifically the Eastern District of Pennsylvania is suffering from a massive opioid epidemic prolificated by the use of prescription narcotics. This epidemic is senselessly robbing thousands of people from their loved ones with each passing day. Tragically, this reality is all too visceral for Ms. Werstler's family, who have no choice but to suffer a daily reminder of their loved one's eternal absence from their lives. It is axiomatic that many (if not most) heroin addicts find the concept of "choice" inherently foreign and forlorn in the context of their addiction. Their days are exclusively dictated by when their next high will be in order to avoid becoming "dope sick." From age 15 until early 2015, Ms. Semler was the archetype of this lifestyle. From dawn until dusk, Ms. Semler's sole objective was acquiring her next dose of heroin. In this pursuit, nothing was off limits; neither morally nor legally. Heroin became her *l'appel du vide*, as she poisoned her body without a fleeting afterthought of her own mortality.

This was Ms. Semler's reality, and the reality for Sarah Semler, Jennifer Werstler, as the trio congregated in an unsanitary public bathroom to get high. It is undisputed that the sole reason for her criminal conduct in this case arose from the unequivocal, insatiable urge to answer her body's call for drugs. An inference could be drawn that Ms. Semler's departure from the bathroom in response to Ms. Werstler's overdose is indicia of a callous, unsympathetic disregard for the well-being of her friend. However, such an assertion overlooks the details that Ms. Semler was essentially a heroin-dependent automaton, whose diminished cognitive reasoning skills were

tempered by a complete dearth of moral rectitude. Emma Semler's addiction does not excuse her conduct, however it does endeavor to explain it.

Ms. Caitlin Thompson, a fellow member of Narcotics Anonymous, shares her personal experience with this tragic plane of existence:

> *From personal experience and the countless experiences of others, I've learned people often do heart breaking things that they would never do if they weren't under the influence or chemically dependent on a substance. While this makes no excuse for committing illegal acts, it often helps in understanding the true nature of people struggling with active addiction.*

While many addicts have resigned themselves to this existence, Ms. Semler has not. As evidenced by the plethora of letters of support attached to this memorandum, Ms. Semler chose to get clean and become a beacon of inspiration for other addicts struggling to emancipate themselves from the chains of their addictions. However, her journey, like many others was not without setback, defeat, and introspective reconciliation. While addicted to heroin, Ms. Semler acted in a manner that was beyond reproach by any traditional notions of societal decency. Ms. Jamie Swartz-Hanley explains:

> *When Emma tells her story, she speaks of these stories but most importantly she doesn't spare herself. Emma tells this story of being so high that it was impossible for her to even comprehend what was taking place on that tragic day. Addicts know one thing when they are using and that is where they can get their next fix to get high and with each relapse they want more.*

Fellow Narcotics Anonymous member Kristen Curcio underscores the tragedy of a life consumed and driven by addiction, and the harsh realities addicts face each and every day:

> *I can tell you that I am a recovering addict, and I celebrated 7 years in recovery on November 9th. I know for myself; I did things during my addiction that I'm not proud of. I've done things that I would never in the right state of mind do to myself, and to others. I know from experience that under the influence of drugs and alcohol, an addict will do unspeakable things, as their conscience and knowing right from wrong is compromised.*

While Ms. Semler's first several attempts at sobriety failed, her continued participation in a 12-step has been the impetus for her and other's success:

"AA and NA participation is associated with greater likelihood of abstinence, often for prolonged periods up to 16 years improved psychosocial functioning, and greater levels of self-efficacy." (Donovan DM, Ingalsbe MH, et al. 12-step interventions and mutual support programs for substance use disorders: an overview. Soc Work Public Health. 2013;28(3–4):313–332. doi: 10.1080/19371918.2013.774663.) "In addition, consistent, early, and frequent attendance/involvement (e.g., three or more meetings per week) is associated with better substance use outcomes. Although even small amounts of participation may be helpful in increasing abstinence, higher "doses" may be needed to reduce the likelihood of relapse. Engaging in other 12-Step group activities (e.g., doing service at meetings, reading 12-Step literature, doing "step work," getting a sponsor, or calling other 12-Step group members or one's sponsor) may be a better indicator of engagement and a better predictor of abstinence than merely attending meetings. In addition, increased involvement in 12-Step meetings and activities following formal treatment may serve as an important source of support and a form of continuing care that has been shown to lead to decreased utilization of mental health and substance abuse treatment services and associated costs." *Id*. "Twelve-step programs serve as readily available, easily accessible, and no cost resources for individuals with substance use disorders. There is clear evidence from a variety of sources that early involvement, in the form of meeting attendance and engagement in recovery activities, is associated with better substance use and psychosocial outcomes as well as reduced health care costs." *Id.*

"Across recovery stages, individuals were 4.1 to 8.6 times more likely to achieve sustained abstinence by continuous 12-Step meeting attendance and involvement." (Krentzman AR,

Robinson EAR, Moore BC, et al. How alcoholics anonymous (AA) and narcotics anonymous (NA) work: cross-disciplinary perspectives. Alcohol Treat Q. 2010;29(1):75–84. doi: 10.1080/07347324.2011.538318.) "Twelve-Step involvement, that is, involvement in such activities as having a sponsor, doing service, reading recovery literature and contacting other 12-Step members outside of meetings, was predictive of continuously sustained abstinence over 3 years for women…Several specific 12-Step activities were predictive of sustained abstinence…including socializing with 12-Step members, reading 12-Step literature, contacting members outside of meetings, step work, identifying as a 12-Step member, and having a sponsor." *Id*.

Finding meaning in tragedy, Ms. Semler began her journey to sobriety shorty after Ms. Werstler's passing and maintained gainful employment in the recovery industry while assisting dozens of others in their respective journeys. Ms. Semler's childhood friend, Ms. Lindsay Fink, shares her observations of Ms. Semler's positive change:

> *Emma hit rock bottom and subsequently made the decision to make a 180 degree turn in her life in regards to her own addiction and her contributions to others who suffer from drug addiction. For the last 2-3 years, she has dedicated her interests and working career to helping drug and alcohol addicts and maintaining her own recovery. She had been attending and presenting at daily NA/AA meetings and prior to incarceration her employment consisted of working as an Administrator/marketer for a private drug recovery center where her job was to make contacts with schools, agencies, hospitals, police and medical rescue, and other outlets to do what she could to encourage addicted individuals they had contact with to get help. Addiction is a huge public health problem; it is not a moral failing. I told Emma that I was proud of her and that her current work and dedication to others is her calling in life.*

Ms. Jeanette Ciminera offers additional insight into Ms. Semler's tremendous personal growth since obtaining sobriety:

> *Emma has fought so hard to get clean and remain clean. Addiction, in my opinion, is the closest you can get to death while living. Physiologically, emotionally, financially – you name it she's fought. She took it many steps further though than succeeding at her own*

> *personal fight. She is determined to share her story and help guide others to stay away from drugs and/or get clean and stay clean. She has been working for this country's good. She's worked in recovery houses, has participated in interventions, assisted in opening a new women's recovery house, amongst so much more. We need her and many more to help spread the word, educate the uninformed, and support the affected…She's making a difference. We, as a society, need her in the public eye to continue her work.*

After having read the transcripts of Ms. Semler's trial, counsel can sense that the Court as well as the Government was underwhelmed by her supporters that attended Court proceedings. This view is in ardent contrast to the many people who have contacted counsel asking to attest to Ms. Semler's good character at sentencing. Emma Semler is distinguished as someone to be relied upon in the fellowship of sobriety. Few can truly empathize with the plight of addicts and their often arduous, painful road to recovery. Ms. Rebecca Dubrowski, a fellow member of Narcotics Anonymous, shares personal insight into the paramount importance of togetherness and emotional support Ms. Semler instilled within her mentees:

> *I met Emma Semler about three years ago in the rooms of Narcotics Anonymous. After years and years of struggling with finding my place in the world and where I fit in it, Emma was one of the few friends that I have met over the years that has always been there for me and always been available to listen to me through the ups and downs that life brings. Regardless of the amount of times that I would mess up and make mistakes, Emma always had faith in me and knew the potential that I bring…With almost 4 years clean, Emma has given me proof that you can live a happy and fulfilling life without the use of drugs*

Dozens of her peers have shared identical observations and insight into Ms. Semler's dedication to the successful recovery of other addicts, all of which share a common motif underscoring Ms. Semler's compassion and dedication to her fellowship. Ms. Eileen Rosati explains:

> *I am an active member of Narcotics Anonymous with over 28 years clean. I am a mother of four wonderful adult children, a grandmother to five beautiful grandchildren, and a Business Manager at one of the nation's largest law firms. I am telling you this to convey the message that we do recover…Addiction is such a conning enemy of life and many have*

> *lost the power to do anything about it. When Emma could have given up and succumbed to her addiction, as so many addicts have, she stayed strong overcoming the worry, the challenges, and the adversity all addicts face when we try to stay clean a day at a time. She has worked her on her recovery and decided to give back by making recovery her career path. Emma is a wonderful young lady who is admired by many in and out of the recovery community*."

Ms. Semler's commitment to her own sobriety and her sponsorship of other addicts in various recovery organizations has had constructive rippling effects within her local community. Fellow Narcotics Anonymous member Ms. Pattie Ceithaml explains:

> *I have known Emma Semler for a couple years but have gotten to know her better in the last year; Emma was good friends with a young woman who I sponsored in NA who lost her fight with addiction. When Emma heard Amy passed, she came directly to my house to be of service, what could she do to help? Did her family need anything? Her son? Me? Emma was more concerned about helping out than about how she felt. The compassion and love she showed was remarkable. The changes that have taken place as a result of recovery are astounding. Emma is an amazing woman of recovery and I'm happy to be a part of her life.*

Ms. Janice Brasher shares her account of Ms. Semler's commitment to the sobriety of others, explaining Ms. Semler's instrumental role in effectuating Ms. Brasher's younger brother's recovery from addiction:

> *My brother had struggled for years as a functional addict unbeknownst to our family. However, in 2017 he no longer could manage the secret of his addiction and it became out of hand. He wanted to make a change and get clean and it was Emma that brought him out of the darkness into recovery. Emma stood by his side while he was in and out of rehabs for months. Doing well then struggling again, Emma was there encouraging him and picking him back up with positive reinforcement every time day and night. Once he reconnected with Emma, she talked with him whenever he needed her and ultimately guided him into a rehab by which he was there for several months then to a halfway house in California to ultimately returning home clean with a full-time job as a financial planner living as a healthy, functional member of society…Emma has a key hand in his journey to sobriety and my family and I will be forever grateful for what she has done for him and what she had done for so many others.*

Ms. Alexandra McClellan, a former addict, provides additional insight into Ms. Semler's selfless commitment to her fellow recovering addicts; underscoring her consistency in going above and beyond the call of duty in order to keep others from straying into the enticing, fatal embrace of narcotics:

> *When I was struggling, she was always there for me no matter what. Whether it was making sure I had food and shelter, or taking me to treatment, she was there and always stood by my side. Emma is hands down one of the most caring, compassionate and supportive friends that I have in my life. She never hesitated to be there for me or anyone else for that matter for whatever they need her for. She is a true example of Narcotics Anonymous and a true example of hope. Her process through active addiction into recovery has been filled with ups and downs, but she has always persevered and fought hard to stay clean no matter what life has thrown at her. She dedicated her sobriety to helping women in recovery and made that her passion. Anyone who knows her, knows that she would do anything to help another struggling addict. I cannot stress enough how much Emma has grown into such a strong woman, whom so many look up to…I can only hope that she will be given the chance to continue on this path in the days to come.*

Mr. Matthew Murphy, a fellow addict in recovery, shares unique personal insight into the person Ms. Semler was prior to her successful recovery, and the rehabilitated, dedicated individual she is today:

> *A lot of people come into recovery with a desire to change, but few are willing to put in the work. This was not Emma. She has always shown major willingness to do what we need to do to get clean, stay clean and become the honest, loving, and helpful woman we know today…Her getting clean was a great thing, but her staying clean throughout this traumatic situation is a miracle and an inspiration to all that know her."*
>
> *"Of my own will I cannot overcome addiction. I need people like Emma to help me, and she has whether she knows it or not. The disease of addiction can ruin the lives of any person; man, woman, rich, poor, educated or not. It does not discriminate, and it can run the life of anyone affected by it. It hinders us from succeeding, and clouds our judgment dictating what we do. I used to use substances against my will and hang around people places and things chasing my fix. It ruined my life many times. A lot of people get to the end of the road and become willing to try to get clean, a few do, and even fewer stay clean for the long road. However, a person with the empathy and selfless love who has overcome active addiction and continues to improve is the best weapon against this disease. This is who Emma has become."*

As many of the attendant letters of support will suggest, Ms. Semler has found her purpose in life assisting addicts in their recovery and personally ensuring the success of her sponsors. It is undisputed that while, Ms. Semler's commitment to the sobriety of herself and others has been a success, there will always be inescapable hamartia derived from her role in Ms. Werstler's death in 2014. Actions which were in stark contravention to her current dedications, and actions that have left her in the wake of tremendous remorse and regret. Ms. Semler will never be able to recompense the Werstler family (or the community) for Jennifer Werstler's death, and will have to live with this reality for the rest of her life. Emma Semler will never shed the feeling of repentance over her role in the loss of her friend. Nonetheless, it is clear that Ms. Semler's actions while released can only hope to pay homage to the tragedy of heroin addiction and the life of Jennifer Werstler. Perhaps one day, Ms. Semler's efforts helping others to be their best sober selves may offer a shred of consolation to those who lost Jenny.

**B. Nature and Circumstances of the Offense – 18 U.S.C. § 3553(a)(1)**

Ms. Semler provided heroin to Ms. Werstler. They used together and Ms. Werstler died, depriving the Werstler family of the love and companionship of their only child. Sadly, the crime committed by Ms. Semler is outdone only by her flight after Ms. Werstler had overdosed.

The nature and circumstances of her crimes are both heart-wrenching and calamitous; Ms. Semler's actions must be punished. Counsel however, implores this Court to consider the context of her rampant addiction at the time of the incident, and its destructive effects on her ability to function as a minimally cognizant human being in society.

**C. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct – 18 U.S.C. § 3553(a)(2)**

The only remotely similarly situated defendant that counsel is aware of is Dillon Quinn. The Court (and the Government) is keenly aware of other defendants with guidelines of 360 months to life. Counsel respectfully urges this Court to contrast Ms. Semler with those other "similarly situated" defendants.

With that, there is no doubt that heroin use is a plague on the communities nationwide, and offenses of this nature should not be taken lightly. However, to see any meaningful and beneficial changes, this case requires us to look at the underlying causes of addiction and their destructive effects on addicts. Ms. Semler is not a violent criminal; she is an addict. Her conduct in the instant case is certainly not an indicator of who she is or what we should expect. At the time of this offense, Ms. Semler was struggling with her own rampant heroin addiction, which was the impetus of all of her criminal conduct, both in the past and presently before the Court. To underscore her addiction's effect on her rational decision making, the very next day, upon learning of Ms. Werstler's death, Ms. Semler used the same heroin to get high.

It is also important to note that Ms. Semler's criminal history is vastly overstated. Ms. Semler has a criminal history score of eight (8), resulting in a Criminal History Category of IV as previously mentioned, all of Ms. Semler's prior offenses are the direct result of addiction.

This calculation also fails to account for her rehabilitative efforts since the time of this offense. Ms. Semler has used her experiences with addiction and recovery to support fellow addicts by chairing AA/NA meetings and assisting the Lower Providence Township Police Department with its first-time drug offense program.

**D. The Need to Provide Restitution to Any Victim of Offense – 18 U.S.C. § 3553(a)(7)**

. Restitution is not applicable in this case.

**E. Purposes of Sentencing – 18 U.S.C. § 3553(a)(2)**

**1. Promoting Respect for the Law and Providing Just Punishment for the Offense – 18 U.S.C. § 3553(a)(2)(A)**

Respect for the law does not result from imposing unnecessarily harsh sentences, but just ones that accurately reflect the guiding legal principles which have been discussed throughout Ms. Semler's Sentencing Memorandum. Further, respect for the law is engendered when a sentence reflects a sincere rehabilitative effort on behalf of a defendant. Ms. Semler has exuded this principle through her post-offense conduct, having devoting herself to the recovery and sobriety of dozens of individuals suffering from addiction in the community at large.

**2. To Afford Adequate Deterrence to Criminal Conduct – 18 U.S.C. § 3553(a)(2)(B)**

Adequate deterrence refers to both the effect Ms. Semler's sentence will have on deterring the crimes of others (general deterrence) and on herself (specific deterrence). A sentence reflecting specific deterrence is not at issue. It is beyond cavil that Ms. Semler is cognizant of the ramifications that her actions progenerated on the date in question. She is remorseful and contrite for the irreparable harm she has caused herself, and most importantly, the Werstler family.

In terms of general deterrence it would be naive to believe that even the most severe sentence that could be imposed by the Court would deter other "Emma Semlers" to behave differently. Conversely, the "general deterrence" goals of sentencing are further engendered by a sentence which takes into account a sincere effort to change and give back to the community. Ms. Semler has not only rehabilitated herself, but she has also used her experiences as a medium to assist countless other addicts struggling to break the tumultuous cycle of addiction and make positive changes in their lives. Accordingly, a sentence which reflects the importance of both personal responsibility as well as servicing one's community will send a message to the general public that while criminal behavior will still be met with punishment, the justice system rewards

those who place their best foot forward and exemplify altruism and selflessness towards their fellow man/woman.

**3. Protecting the Public from Further Crimes of the Defendant – 18 U.S.C. § 3553(a)(2)(C)**

Ms. Semler fights every day to overcome her addiction and concurrently the impetus by which her criminal conduct was born. As mentioned above, Ms. Semler has been drug-free since 2015 and has dedicated her life to helping others in her community struggling with addiction by chairing AA/NA meetings, assisting law enforcement with a first-time drug offense program with the Lower Providence Township Police Department in Eagleville, Pennsylvania. She has also sponsored dozens of women in their recovery. Accordingly, it is respectfully submitted that Ms. Semler is not a threat to the public, and only wishes to continue her efforts to assist in the sobriety and vitality of her community

**4. Providing the Defendant with Needed Education and Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner – 18 U.S.C. § 3553(a)(2)(D)**

Ms. Semler does not require additional educational or vocational training. She would benefit by continued participation in a twelve-step program.

## VII. ROLE IN THE OFFENSE

Ms. Semler was an addict who along with her sister and Ms. Werstler, traveled to Philadelphia to purchase heroin from her dealer. They used together and Ms. Werstler died. While counsel respectfully believes that Emma Semler was not the intended target of legislature, she is culpable and should be punished accordingly.

## VIII. REQUEST FOR VARIANCE

For the aforementioned reasons, counsel respectfully requests the Court to vary downwards and sentence Ms. Semler to the mandatory minimum of 240 months of incarceration.

Respectfully submitted,

**/s/ S. PHILIP STEINBERG**
S. PHILIP STEINBERG, Esquire
Attorney for Defendant
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19102
Phone: (215) 845-2500

**CERTIFICATE OF SERVICE**

S. Philip Steinberg, Esquire hereby certify that a true and correct copy of the within Sentencing Memorandum has been served electronically upon:

**THE HONORABLE GENE E.K. PRATTER**
United States District Judge
United States Courthouse, Room 10613
601 Market Street
Philadelphia, Pa. 19106

**Andrea N. Phillips Esquire**
Assistant United States Attorney
U.S. Department of Justice
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

**Christopher L. Boyer, U.S. Probation Officer**
U.S. Probation Office
William J. Green Federal Building
600 Arch Street, Suite 2400
Philadelphia, PA 19106

**/s/ S. PHILIP STEINBERG**
S. PHILIP STEINBERG, Esquire
Attorney for Defendant
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19102
(215)-845-0250