IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| EMMA SEMLER | : | NO. 17-120 |

## MEMORANDUM

### INTRODUCTION

Emma Semler stands charged with distribution and aiding and abetting the distribution of heroin, resulting in death, in violation of 21 U.S.C. §841(a)(1), (b)(1)(C), and 18 U.S.C. §2, and distribution of heroin resulting in death, within 1,000 feet of a playground, in violation of 21 U.S.C. §860(a) and 18 U.S.C. §2. Ms. Semler faces a maximum sentence of life imprisonment, a mandatory minimum of 20 years in prison and a Guideline range of 360 months to life imprisonment.

The Court has considerable familiarity with Ms. Semler. Having been indicted on March 8, 2017, Ms. Semler succeeded in her first bail effort to win judicial trust in her supposed intention and ability to respect the rules attendant to pretrial release. The specifics of Ms. Semler's conduct between her pretrial release on March 27, 2017 and her conviction following a seven-day jury trial in December 2018, and the Court's consideration of that conduct, will be addressed below, figuring substantively in the Court's ruling today.

Following the guilty verdict, the Court imposed a sentence of 252 months' imprisonment, a six-year term of supervised release and a fine of $2,500. Ms. Semler has remained in prison during the pendency of her appeal. Her appeal raised three issues: (1) that the evidence at trial was insufficient to establish that she had "distributed" the deadly substance; (2) that the Court erred in denying the defense requested jury instruction on the element of "distribution", and (3) that the

Court erred in denying the defendant's requested "proximate cause" instruction.  While rejecting Ms. Semler's first and third arguments, a divided panel of the Third Circuit Court of Appeals accepted Ms. Semler's second argument, thus reversing the jury verdict of guilt and remanding the case for a new trial. *See United States v. Semler*, No. 19-2319, 2021 WL 2201598 (3rd Cir. June 1, 2021) (non-precedential opinion). Ms. Semler's Motion for Release Pending Appeal (Doc. No. 201) followed quickly thereafter.  The Government opposes the Motion.

Following a July 29, 2021 hearing attended by Ms. Semler, her counsel, her witnesses and the Government, and recognizing that the Court has expressed an intention to set the date for the retrial of this matter as quickly as clerk-of-court machinations can be prompted to act in the early fall of this year, the Court concludes that the defense motion should be, and is, denied because the law and the factors set out in 18 U.S.C. §3142 and judicial precedent counsel the Court to do so.

## **THE LEGAL FRAMEWORK**

Title 18 U.S.C. § 3142(g) delineates the factors that the Court is to consider to determine whether a person should be released or detained. These factors are:

1. the nature and circumstances of the offenses charged;
2. the weight of the evidence against the defendant;
3. the history and characteristics of the defendant including
   a. employment history, financial resources, drug abuse, criminal history and record of appearance at court proceedings, and
   b. whether he was on supervision at the time of his offenses or arrests or was on release pending court proceedings;
4. the dangerousness to any person or the community.

The Bail Reform Act provides that, concerning specified crimes, a rebuttable presumption arises that the defendant presents a risk of flight and that no condition or combination of release conditions will reasonably assure the safety of any other person and the community.

> Subject to rebuttal...it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the

>safety of the community if the judicial officer finds that there is probable cause to believe that the person committed:
>
>(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)...

18 U.S.C. § 3142(e)(3)(A).

When this presumption arises, a defendant must rebut the presumption by presenting some credible evidence that she will not flee and does not pose a threat to the community. United States v. Suppa, 799 F.2d 115, 120 (3d Cir. 1986). Evidence pertaining solely to "character and lifestyle" or alleged community ties is insufficient to carry this burden. United States v. Delker, 757 F.2d 1390, 1396 (3d Cir. 1985). See also, United States v. Strong, 775 F.2d 504, 508 (3d Cir. 1985).

Our Court of Appeals has reminded the trial courts, defendants and the public that "[t]he statutory language, as well as the legislative history [of the Bail Reform Act], unequivocally establishes that Congress intended to equate traffic in drugs with a danger to the community." Strong, 775 F.2d at 506. The Government highlights in its brief that Congress and the Third Circuit have provided further guidance:

>The [Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence. ... The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."

Id. at 507 (quoting S.Rep. No. 225, 98th Cong., 2d Sess. 12-13) (emphasis in original). Congress and the Third Circuit Court of Appeals further recognized: "It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs, and, thus, because of the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism." Strong, 775 F.2d at 507 (quoting S.Rep. No.225, 98th Cong., 1st Sess. 20).

**EMMA SEMLER**

The accusations against Ms. Semler are serious, as is her history of repeated incidents of drug abuse, both addictive and transactional. The indictment charges her with supplying to Jennifer Werstler, Ms. Semler's 20-year-old acquaintance, a deadly dose of heroin, a needle and water to use in order to inject the heroin. After accompanying Ms. Werstler and her younger sister, Sarah Semler, into the restroom at a Kentucky Fried Chicken fast food restaurant where the three used the heroin, when Ms. Werstler began to show symptoms of overdosing on the heroin Ms. Semler had procured for and provided to her, rather than rendering or seeking assistance, Ms. Semler reportedly attempted to clear the bathroom of evidence of the drugs and drug use before fleeing the scene. Ms. Semler's arrival and departure to and from the Kentucky Fried Chicken is recorded on video tape. Ms. Werstler was left to die alone in the bathroom[1].

On the day of these events Ms. Semler was already on probation for another offense. She had been arrested on May 8, 2014 by Philadelphia police officers for purchasing heroin and crack cocaine in Philadelphia's Kensington section. She was released on bail very early the next morning, and the events involving Ms. Werstler occurred less than 24 hours later. Before these events, Ms. Semler already had a substantial history of buying drugs and providing them to others, so much so that the Government calls upon evidence that Ms. Semler even had a discount from her narcotics dealer and that she frequently collected money from others who did not want to make their own drug purchases in Philadelphia

The Court is well aware that the forgoing events happened more than seven years ago. The Court also knows that Ms. Semler's latest lawyer (who was not a first-hand participant or observer at

---

[1] The details of the evidence concerning Ms. Semler will not be recounted here, inasmuch as they have been recited repeatedly in prior opinions of the Court, in the Government's various briefs and, of course, in the trial record from the December 2018 jury trial. Suffice it to say, the defendant's documented conduct proved to be deadly to Ms. Werstler.

4

Ms. Semler's jury trial or the various pre-trial proceedings) is an experienced and passionate advocate who characterizes Ms. Semler with a very different interpretation and emphasis than the indictment or evidence suggests.  The Court even accepts defense counsel's optimistic description of Ms. Semler as having been successful in defeating her addiction in the last several years while she has been in prison, suggesting, as counsel does repeatedly, that Ms. Semler no longer has the debilitating desire to engage in drug-related activities as she once did. This is the same optimism expressed by her family members who testified in support of her application for release.

But the Court cannot accept -- or even take with a grain of salt -- counsel's description of Ms. Semler having exhibited "exemplary compliance" with conditions the Court previously set as terms for Ms. Semler's release before and during her trial on these same charges.  Defendant Semler's Reply To Response To Motion For Release Pending Appeal And Retrial, Doc. No. 204, p. 4.  Far from it.

Following Ms. Semler's arrest, the Magistrate Judge approved a pre-trial release arrangement on conventional conditions which this Court modified to include home detention and electronic monitoring conditions.  Upon Ms. Semler's later application for further flexibility, ostensibly for work and drug rehab purposes, the Court allowed Ms. Semler to travel to and from New Jersey for work-related purposes and, of more relevant import to the instant issues, the Court accepted the defense representation that Ms. Semler's efforts to overcome her persistent drug addiction necessitated her regular use of a commercial gym as part of her Narcotics Anonymous regime.  Soon thereafter the Government challenged Ms. Semler's apparent abuse of the supposed addiction-defeating gym privileges by presenting the Court with social media posts showing Ms. Semler (who was not in typical work-out clothes, favoring instead a bikini) under the protective arms of a bare-chested male gym enthusiast.  (Government's Response In Opposition To Defendant's Motion To

Amend Pretrial Release, Doc. No. 32, Ex B).  At the hearing to address Ms. Semler's use of the gym, even defense counsel was at a loss to try to justify her client's conduct.

The Court revoked the defendant's gym privileges and observed that if work-outs were indeed part of the defendant's strategy for resisting use of heroin perhaps she should exercise in the confines of her home instead.

Even after receiving the Courts admonitions and expressions of a suspicion that Ms. Semler had either misrepresented her gym plans in the first instance or had simply abused the Court's permission once it was secured, Ms. Semler exhibited neither contriteness nor a renewed sense of co-operation.  In other incidents while she was on pre-trial release, Ms. Semler continued to demonstrate what amounted to almost incorrigibility when it came to pushing the limits of, if not outright violating, the conditions imposed on her pretrial release, including unabashedly highlighting herself doing so to her friends and countless others with social media posts.  During her pretrial release, Ms. Semler directly or indirectly posted photographs of herself socializing with her contemporaries on her Facebook page.  Indeed, in one of these postings showing again bikini-clad Emma Semler again underneath the arm of a fellow party-goer her electronic monitoring anklet can easily be seen.  Then, at a time when Ms. Semler was on home detention and supposedly meeting with her Narcotics Anonymous sponsor and/or presumably preparing for her criminal trial which was to start in a few days, another photo of Ms. Semler and her N.A. sponsor was posted to social media with captions that referenced a "Black Friday" shopping excursion to the King of Prussia Mall.  This is not the sort of conduct that prompts the description of "exemplary conduct" or engenders confidence that Ms. Semler appreciates either the importance of court orders or the gravity of her own situation.  Indeed, based upon the Court's actual experience with Ms. Semler directly, one might be tempted to conclude that she has not tried to hide what might be characterized as an insolent affect.  Based on Ms. Semler's conduct before this Court, if one were to wonder if Ms.

Semler was someone who would seek permission or wait to ask for forgiveness, the conclusion might well be that Ms. Semler has had no inclination either way.

In light of this recorded background, the Court turns to Ms. Semler's latest proposal for release and a consideration as to whether there is a reasonable or rational basis to permit her to be released awaiting her retrial.

At the hearing scheduled to give the defense the opportunity to satisfy Ms. Semler's statutory burden, the Court heard the testimony of two family members residing in New Jersey who have been suggested by defense counsel as appropriate alternative third-party custodians for Ms. Semler, subject to "conditions otherwise similar to what had been imposed previously." 7/29/21 Bail Hrg., N.T. 6, lines 7-8. Counsel suggests either Ms. Semler's 89-year-old grandmother (Ms. Erdelsky) or her aunt (Ms. Layton). The Court accepts the representation that the physical inspection of both homes was satisfactory and also accepts the honorable intentions and earnest candor of both Ms. Erdelsky and Ms. Layton.

Neither of these family members have the wherewithal to meet the Court's serious, disclosed concerns about Ms. Semler's risk of flight or the potential danger to others if Ms. Semler were released, no matter the conditions. Ms. Semler's grandmother shared not only her limited hearing capabilities, 7/29/21 Bail Hearing N.T. 9 (l. 25) - 10 (l. 1), but also her recent incident of suffering a broken back which, because she lives alone, necessitates her having to arrange for a neighboring child to come to her home to provide assistance. 7/29/21 Bail Hearing N.T. 10 (l. 25) – 11 (l. 1-3). The Court understands that Ms. Erdelsky would very much benefit from her granddaughter's release and hoped for help, as she candidly disclosed. 7/29/21 Bail Hrg., N.T. 11 (l. 25) – 12 (l. 1-4); 13 (l. 1-12). But the potential assistance for defendant's grandmother, of course, is not the important standard or focus for the Court to consider. In rejecting the proposal that Ms. Semler be released to her grandmother's custody, the Court does not for a minute doubt Ms. Erdelsky's mental acuity or,

7

as she stated, her willingness to "do anything to get [Ms. Semler] home" with her. 7/29/21 Bail Hearing N.T. 19 (l. 14-15). In fact, the Court recalls quite clearly Ms. Erdelsky's steadfast - - almost combative - - quick verbal parrying with and about law enforcement and judicial proceedings during a pre-trial hearing that concerned her other granddaughter, Sarah Semler, who also faces or at least then faced, serious drug addiction challenges and who was and perhaps still is a substantive witness identified by the Government as part of the case against Emma Semler. The Court also accepts that Ms. Erdelsky regrets and very likely abhors Emma Semler's "uncontrollable" drug abuse. 7/29/21 Bail Hearing N.T. 17 (l. 4-15). Her views and intentions, however, are insufficient to persuade the Court that releasing Ms. Semler to Ms. Erdelsky's custody and supervision is even remotely appropriate to meet the statutory standards upon which the Court must focus.

Similarly, living with Ms. Layton, who described herself as having "been a big part of [Emma Semler's] …entire life ," 7/29/21 Bail Hearing N.T. 21 (l. 19-20) , is not a viable option either. Ms Layton explained that she would be away from home at work during daily business hours, apparently leaving her 27-year-old daughter with Ms. Semler. 7/29/21 Bail Hearing N.T. (l. 1-10). This provides the Court with little confidence for the necessary supervision of Ms. Semler, given that Ms. Layton claims that her daughter is "very close with Emma" and "always was a very good influence in Emma's life when things were tough;" 7/29/21 Bail Hearing N.T. 22 (l. 24-25) -23 (l. 1). The Court was not introduced to Ms. Layton's daughter who would have such an important custodial role. However the Court must observe that the cousin's prior "good influence" seemingly did not extend to either ameliorating "when times were tough" Ms. Semler's prior drug use or the lawless conduct leading to drug purchases, arrests, of course, disrespecting the Court's previously-imposed bail conditions in favor of anything-but-shy social media posting and socializing generally. Ms. Layton's admission that she "was very disturbed" by Ms. Semler's prior lack of respect for the Court's requirements may not even approach the level of the Court's concern. 7/29/21 Bail Hearing

N.T. 26 (l. 12-24). Ms. Layton expressed her view that previously she has not believed it to be her role to police her niece's compliance with the Court's conditions. ("That's up to the courts to police that." 7/29/21 Bail Hearing N.T. 31 (l. 11-20)). Presumably Ms. Layton continues to eschew such a role. To be sure, this Court will not shirk the obligation Ms. Layton assigns to it.

Ms. Layton may well be "a drill sergeant," 7/29/21 Bail Hearing N.T. 43 (l. 21-22), but based on the family's decidedly unsuccessful history trying to control Ms. Semler, the Court believes that too many more troops would need to be dedicated to assuring that Ms. Semler, who faces a lengthy prison sentence and who now knows considerably more about prison life and whose sobriety coincides with imprisonment rather than outside life, would neither flee nor endanger herself or others if she was released. For example, Ms. Semler's Narcotics Anonymous sponsor, Stephanie Wolf, testified that she has known Ms. Semler through the N.A. community for four or five years but notwithstanding the familiarity describes herself as being "a little surprised" to hear about Ms. Semler's lack of respect for the bail conditions previously imposed on her because Ms. Wolf did not "see that in her," 7/29/21 Bail Hearing N.T. 51 (l. 2-5). This suggests to the Court that Ms. Semler may well be able to escape or trick the watchful eye of her well-intentioned N.A. sponsor and friend. Similarly, the Court is well aware that defense counsel makes much of the report that Ms. Semler has reportedly performed well at her prison job. However, even fully crediting the report of appropriate behavior when she is monitored in a prison setting, that does not translate into evidence that Ms. Semler will do so if she is released. That leap of faith, as the Court explained in detail to counsel, dictates needing much more. Specifically, well beyond the vague expression of a willingness by Ms. Semler's father (who had never attended any of the previous court hearings concerning his daughter's case) to post unspecified property to secure a $50,000 bail obligation, what the Court identified as a "gap" in the defense application for release is the absence of direct evidence of Ms. Semler's own current attitude about law enforcement, outside-imposed restrictions

9

and rules, or the Court's requirements. The defense declined to have Ms. Semler speak at the hearing, and that is certainly her right. The Court's intention was to make sure Ms. Semler and her counsel had every reasonable opportunity to address the Court's articulated concerns.

However, in the light of the Court's responsibilities to the integrity of the judicial system, including the expectation that Ms. Semler will appear at her retrial,[2] and the protection of the community, the Court concludes that the proposal tendered by the defense falls short of the mark to justify the realities of the risks of releasing Ms. Semler at this time. Based on the Court's experience with the defendant, the nature of the evidence in the Government's case against her, the severity of the potential sentence if she is again convicted and the undeniably pernicious nature of drug addiction, the Court is not confident that any realistic conditions could be imposed upon Ms. Semler for her release under the governing statute, 18 U.S.C. § 3142(e) and (f).

## **CONCLUSION**

Therefore, the defense motion for release pending retrial is denied.[3]

BY THE COURT:

*s/Gene E.K. Pratter*

**GENE E.K. PRATTER**
**United States District Judge**

---

[2] Defense counsel suggests that an acquittal is "a far better prospect … at the retrial ," Defendant Semler's Reply To Response To Motion For Release Pending Appeal And Retrial at 4 (fn. 2) (Doc. No. 204). However, the Court is inclined to be less presumptuous about the outcome of federal jury trials than defense counsel.

[3] If and as circumstances may change, Ms. Semler may reapply for release.